Maurice **ROBBINS**, ind., and t/a **Robbins Motor Transportation**

v.

**UNITED STATES** of America and Interstate Commerce Commission.

Civ. A. No. 28068.

United States District Court
E. D. Pennsylvania.

April 12, 1962.

Herbert M. Linsenberg, Meltzer & Schiffrin, Philadelphia, Pa., for plaintiff.

Leonard S. Goodman, Robert W. Ginnane, Washington, D. C., for Interstate Commerce Commission.

Lee Loevinger, Asst. Atty. Gen., Richard A. Solomon, Atty., Dept. of Justice, Washington, D. C., Drew J. T. O'Keefe, U. S. Atty., Philadelphia, Pa., for the United States.

Before HASTIE and GANEY, Circuit Judges, and KRAFT, District Judge.

GANEY, Circuit Judge.

This matter is before a three-judge court on a complaint to set aside an order of the Interstate Commerce Commission denying the application of plaintiff, a common carrier by motor vehicle with its principal place of business in Philadelphia, Pennsylvania, for a certificate of public convenience and necessity under § 207(a) of the Interstate Commerce Act, 49 U.S.C.A. § 307(a), and to grant the application. The latter, filed June 25, 1959, seeks authority to extend his operations as a common carrier by motor vehicle, by single line over irregular routes, in the transportation of "machines and machinery, and parts and accessories thereof, which, because of size and weight, require special equipment," between Essington, Emmaus and Mertztown, Pa., on the one hand and various points in 13 States on the other.[1]

At a hearing held on September 11, 1958, before an examiner of the Commission, only two witnesses testified in favor of issuing the application: the plaintiff, who testified as to his fitness and ability to perform the services, and Joseph R. Conlin, who told about the asserted need for the services. Conlin was the superviser of traffic and shipping for the prospective shipper, the Westinghouse Electric Corporation, Steam Division, located in Essington, Pa. Westinghouse manu-

---

1. The thirteen states are: Florida, Georgia, Indiana, Kentucky, Maine, Michigan, New Hampshire, North Carolina, Ohio, South Carolina, Tennessee, Vermont and West Virginia.

factures a wide range of commodities, including, but not limited to, turbines, steam condensers, pumps, generators and jet engines. These commodities and accessories used in connection with them are shipped by Westinghouse to and received from points in the 13 States set forth in plaintiff's application. Its plant is on a railroad siding, and about 70 percent of the outbound shipments is by rail and the remainder by motor carrier, either by direct-line service or inter-line service, or joint-line service, or a combination of the latter two services.[2] About 30 to 40 percent of the outbound shipments is to the 13 States involved. The outbound volume is about 4,000 tons each month, of which only a relatively small percentage is transported by specialized, heavy-haul motor carrier. The largest components shipped are 14 by 35 feet, weighing between 60,000 and 70,000 pounds.[3] Excluding shipments of fuel, the inbound volume is small in comparison to the outbound volume. Westinghouse desires the direct-line services of a motor carrier, with specialized equipment for heavy hauling, conveniently located near its plant, on a standby basis, so that it will be able to promptly notify that carrier of any sudden changes or plans of shipment. It does not consider the existing services involving the transportation of the very heavy or cumbersome commodities adequate to its needs.

Plaintiff's terminal is located about 5 miles from the prospective shipper's plant and his services in both interstate and intrastate shipments have been used by it

for about 6 years and have been found to be highly satisfactory.

In protest to the issuance of the certificate were two railroad companies, nine common carriers by motor, and the Heavy and Specialized Carriers Section of the Local Cartage National Conference and nineteen members thereof. After the hearing, the examiner filed his report and order on October 9, 1959, recommending (1) that the application be granted, but limited to the transportation "of turbines, complete, or sectionalized, and condensers, pumps, generators, coolers and blowers therefor, generators and engines combined, and reduction gears and parts therefor, and machinery parts and accessories used in connection with the above named commodities," strictly between Essington, Pa., and points in the 13 States, and (2) that in all other respects the application be denied for failure of the applicant to sustain his burden of proof. The examiner specifically found that "the applicant is fit, willing and able properly to perform such services and to conform to the requirements of the Interstate Commerce Act and the Commission's rules and regulations thereunder." This finding is unchallenged. The protestants filed exceptions to that part of the report recommending the issuance of the certificate. Although plaintiff replied to these exceptions, he did not object to the recommended partial denial of his application by the examiner. On January 26, 1959, Division 1 of the Commission filed its report.[4] As supplemented by its own, it adopted the findings of

---

2. *Direct-line service* is that type of service by which a single authorized carrier provides the transportation from point of origin to point of destination without the necessity of leasing the equipment to another carrier, taking on the driver of another carrier or changing the bill of lading.

    *Inter-line service* is that type of service by which the originating carrier's equipment is leased, until the transportation is completed, to one or more authorized carriers at points of interchange for operation under their respective authorization. This type of service requires change of bill of lading.

    *Joint-line service* is that type of service by which the originating carrier transports the commodities on its own or leased equipment as far as it is permitted and then it transfers the commodities or load to a connecting carrier. Unless interline service is thereafter used, the transfer of the load is repeated until the transportation is completed.

3. These large and heavy commodities take a comparatively long time to design and manufacture.

4. Docket No. MC–45764 (Sub. No. 8).

the examiner, and accepted the recommendations denying the application to the extent proposed by him. After making some findings of its own and limiting its discussion to the issues raised by the exceptions, the Division refused to follow the recommendations of the examiner as to the partial allowance of the application and denied it in its entirety.[5] The basis for the denial was the finding that plaintiff had failed to establish that the present or future public convenience and necessity require any of his proposed services. In part the Commissioner's report states:

> " * * * There is no evidence that motor carrier service has been unavailable to shipper during recent years when and as needed or that any contractual penalty ever has been imposed on it because of delayed delivery * * *. Arrangements for such transportation can usually be planned somewhat ahead of the actual movement and advance notice thereof be given to the carrier. Of more importance, we find that the asserted need shown by the single supporting shipper for the transportation of the involved commodities can reasonably be met by existing carriers * * *. The evidence adduced shows that adequate single-line service is available to several of the involved destination States and that joint-line service is available to the balance thereof. There is no showing that the latter service has caused shipper any material difficulty during recent years * * *. The single-line transportation available has never been given a trial by shipper, even though its use thereof has been solicited by one or more of the motor protestants. Mere conjecture or surmise, as expressed by shipper, regarding a possible future unavailability of the satisfactory inter-line

service does not warrant granting authority for additional service. Neither does a mere preference of a shipper for the service of a specific carrier warrant certification of service by that carrier."

On April 24, 1959, the entire Commission denied plaintiff's petition for reconsideration "for the reason that the findings of Division 1 are in accordance with the evidence and the applicable law."

■ Plaintiff claims here that the Commission's findings, in view of all the evidence presented to it, were arbitrary and capricious. He asserts the Commission ignored the evidence offered by his witness which, he says, clearly demonstrated the existing inadequacy of transportation between the points covered by his application. One of the basic ingredients in the determination of public convenience and necessity is the adequacy of existing service. Hudson Transit Lines, Inc., v. United States, 82 F.Supp. 153 (S.D.N.Y.1948), aff'd, 338 U.S. 802, 70 S.Ct. 59, 94 L.Ed. 485. And the burden of producing evidence to show that "the proposed service, to the extent to be authorized by the certificate, is or will be required by the present or future public convenience and necessity" is on the applicant. Sinett v. United States, 136 F.Supp. 37, 40 (D.C.N.J.1955); Quickie Transport Company v. United States, 169 F.Supp. 826, 829 (D.C.Minn. 1959), aff'd, 361 U.S. 36, 80 S.Ct. 140, 4 L.Ed.2d 111; McBride's Express, Inc., v. United States, 173 F.Supp. 539, 543 (D. C.Ill.1958). Since the evidence of the adverse effect on them is generally within their control, the protesting carriers should come forward with information of that nature to persuade the Commission to deny the certificate. See Clarke v. United States, 101 F.Supp. 587, 594 (D. C.D.C.1951). Of course the Commission cannot capriciously ignore evidence. At the same time it is not bound to accept

---

5. The Commission is not bound to accept the examiner's findings, and may reject his recommendations. It is not only at liberty to do so, but it is required to reach its own conclusions upon the evidence. Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 285–286, 53 S.Ct. 627, 77 L.Ed. 1166 (1933); Sinett v. United States, 136 F. Supp. 37, 40 (D.C.N.J.1955).

**82**

the evidence of an applicant at its face value.

With the above principles in mind we have reviewed the record before the Commission. That record reveals a logical basis for the Commission's conclusion that the plaintiff has not met his burden. That a particular shipper desires the services in question is not as weighty a factor in a § 207(a) proceeding as it would be in a § 209(b) proceeding for a permit to act as a contract carrier. Cf. Interstate Commerce Commission v. J–T Transport Company, Inc. et al., 368 U.S. 81, 89, 82 S.Ct. 204, 7 L.Ed.2d 147 (1961).

■■■ In addition to concluding that the plaintiff had not met his burden of proof, Division 1 went on to find that the asserted need of the prospective shipper can reasonably be met by existing carriers and that adequate single-line service is available to several of the 13 States and joint-line service is available to the remaining States. Plaintiff maintains that there is not a shred of evidence in the record that connecting carriers are willing or able to provide connecting service to supply the needs of Westinghouse. Findings made by the Commission must be supported by substantial evidence before they will be upheld by the courts. Public Service Commission of Utah v. United States, 356 U.S. 421, 427, 78 S.Ct. 796, 2 L.Ed.2d 886 (1958); United States v. United States Smelting Refining & Mining Co., 339 U.S. 186, 193, 70 S.Ct. 537, 94 L.Ed. 750 (1950). We think there was substantial evidence to support the Commission's finding concerning the existence of available service and that the Commission did not rely solely upon a presumption on this point. It is true that all the possible existing connecting carriers did not appear as protesting witnesses. But it must be remembered that proceedings before the Commission are not contests between competing common carriers. See Eastern-Central Motor Carriers Association v. United States, 321 U.S. 194, 64 S.Ct. 499, 88 L.Ed. 668 (1944). "Under the National Transportation Policy as de-

clared by Congress and as construed by the Supreme Court the issuance of a certificate of public convenience and necessity requires determination by the Commission of the prejudice, if any, which will result therefrom to existing properly authorized carriers. Further, the adequacy of existing service is a proper item for consideration by the Commission in such a proceeding." Parkhill Truck Company v. United States, 198 F. Supp. 362, 364 (D.C.N.D.Okl.1961). Also see Filson v. Interstate Commerce Commission et al., 182 F.Supp. 675 (D.C. Colo.1960). At the hearing before the examiner the 1958 edition of the official directory, which lists the names of the local and short haul motor carriers, including heavy and specialized carriers, in the United States, was introduced into evidence. It is published by the Local Cartage National Conference "as a service to shippers of the country so that they may quickly locate a particular carrier in some distant place." An advertisement by members of the so-called "red book" plan appearing on the inside cover of the directory states in part: "One part of the R. B. P. (Red Book Plan) better kind of service is an 'agreement' among the country's leading heavy and specialized carriers, which enables them to offer you a complete and specialized service in the transportation of any article which because of its size, shape or weight requires the use of special equipment. Through this Red Book Plan, carriers party to its 'master contract' are able to interchange among one another without change of driver or equipment at point of interchange * * * *

"Heavy & Specialized carriers who are members of the Red Book Plan are usually referred to as 'Members of the Red Book' or 'Red Book Members' * * *." One hundred and one members variously located in 58 cities are listed as being members of this plan.

■■■ The Commission is not unfamiliar with the "red book" plan and the members thereof, and, unless there are complaints to the contrary, it may rely upon

that organization of motor carriers to supply the services which it offers to shippers.[6]

█ Plaintiff argues to us that the Commission completely ignored and failed to answer his contention that the "red book" plan, as described in the record, was in violation of the Interstate Commerce Act. Part 207 of the Commission's regulations deals with the leasing and interchanging of vehicles by motor carriers. Section 207.5, 49 C.F.R. (1961) 207.5, expressly provides for interchange of equipment by connection carriers. Section 207.3, as amended September 15, 1961, 26 F.R. 8624, exempts, under certain conditions and with two exceptions, equipment from the requirements of the regulations. Prior to its being amended, this exemption was held to be a valid one. American Trucking Associations, Inc. v. United States, 344 U.S. 298, 314–315, 73 S.Ct. 307, 97 L.Ed. 337 (1953). The amendment, in our opinion, did not change its validity. Plaintiff has not shown that the members of the "red book" plan are unable or unwilling to meet the requirements of § 207.3 of the regulations. The findings of the Commission are supported by substantial evidence.

█ Were we of the mind to do so, we are without power to grant the application: Pan-Atlantic S. S. Corp. v. Atlantic Coast Line R. R. Co., 353 U.S. 436, 440, 77 S.Ct. 999, 1 L.Ed.2d 963 (1957); or to order the Commission to award a certificate of public convenience and necessity to plaintiff. Carolina Scenic Coach Lines v. United States, 56 F.Supp. 801, 803 (W.D.N.C.1944), aff'd, 323 U.S. 678, 65 S.Ct. 277, 89 L.Ed. 550.

This opinion shall constitute the Court's findings of fact and conclusions of law, as required by Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Accordingly, the relief prayed for by plaintiff will be denied and the complaint will be dismissed.

6. The Commission has relied upon the "red book" plan in other cases. For example, see Julia A. Hagan Extension-Poles,

Piling, Lumber and Ties, 78 M.C.C. 803 (Div. 1, 1958).