AMERICAN BUSLINES, INC., Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants.

AMALGAMATED TRANSIT UNION, AFL–CIO, Plaintiff,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

American Buslines, Inc., National Association of Motor Bus Owners, Intervening Defendants.

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA and Local Union 549, Plaintiffs,

v.

UNITED STATES of America and Interstate Commerce Commission, Defendants,

Overnite Transportation Company and Rutherford Freight Lines, Inc., Intervening Defendants.

Civ. A. Nos. 644–65, 684–65, 894–65.

United States District Court
District of Columbia.

April 20, 1966.

James E. Wilson, Warren Woods, and Jon F. Hollengreen, Washington, D. C., for plaintiff in Civ.A. No. 644–65 and for intervening defendant, American Buslines, Inc., in Civ.A. No. 684–65.

I. J. Gromfine and William B. Peer, Washington, D. C., for plaintiff in Civ. A. No. 684–65.

Herbert S. Thatcher and David S. Barr, Washington, D. C., for plaintiffs in Civ. A. No. 894–65.

William H. Orrick, Jr., Asst. Atty. Gen., of United States, and John H. D. Wigger, Dept. of Justice, David G. Bress, U. S. Atty., Robert W. Ginnane, Gen. Counsel, and Leonard S. Goodman, Asst. Gen. Counsel, Interstate Commerce Commission, Washington, D. C., for defendants.

Robert J. Corber, Washington, D. C., for intervening defendant, National Association of Motor Bus Owners, in Civ.A. No. 684–65.

J. W. Alexander, Jr., Charlotte, N. C., and W. T. Croft, Washington, D. C., for intervening defendants, Overnite Transportation Co. and Rutherford Freight Lines, Inc., in Civ.A. No. 894–65.

Before BURGER, Circuit Judge, and McGUIRE and CURRAN, District Judges.

CURRAN, District Judge.

Two of these consolidated civil actions involve attacks by two labor unions upon orders of the Interstate Commerce Commission in Midwest Buslines, Inc.—Purchase (Portion)—American Buslines, Inc., 97 M.C.C. 426, and in Overnite Transportation Co.—Purchase—Rutherford Freight Lines, Inc., 97 M.C.C. 568, on the grounds that the Commission gave too little financial protection to adversely affected employees in certain financial transactions between motor carriers. The third action, filed by American Buslines, Inc., seeks to set aside the order entered in the Midwest case for the alleged reason that the Commission gave too much protection to the affected employees. These three actions are filed pursuant to 28 U.S.C. §§ 1336, 1398, 2284, and 2321–2325.

This is the second time that the *Midwest* case is before the Court, as neither the union nor the buslines company was satisfied with the order of the Commission on the remand. The *Overnite* case was filed by the Teamsters Union and is an attempt to reargue the legal issues presented in the first appeal of the *Amalgamated* case. In that case, the Commission approved the purchase of two of the American Buslines routes by Midwest Buslines and reserved jurisdiction for three years to entertain any employee petitions regarding needed financial protection from a possible adverse effect of the transaction. The purchase was completed December 31, 1959. On September 20, 1960, the Commission granted Amalgamated's petition to reopen the proceeding, allowing it to show "specifically how, and to what extent, particular employees of the carriers concerned have been adversely affected". The Commission de-

clined to impose any conditions on behalf of the employees in the reopened proceeding.

This Court set aside the order of the Commission, stating it "need not attempt to delineate what measure of relief, if any, should be provided to the employees of American Buslines, Inc.," and "that if any particular measure of relief is one which would ordinarily be granted to railroad workers similarly situated, the Commission should not deny it to the employees of American Buslines, Inc., without a reasoned explanation of its denial, consistent with what has here been said". On the remand of the *Amalgamated* case, the Commission reopened its proceedings but stated that it was "for consideration on the record as made".

In August, 1964, the Commission issued its report on reconsideration. It conditioned its order upon payment by American of a "lump sum settlement" to certain of the employees to cover "loss of pay while moving, temporary maintenance of two households, and the excess of rents and utilities costs paid for a period of one year after the date of such reassignment". The Commission also provided compulsory arbitration if there was any disagreement over this protection that might arise between the bus company and the union. In February, 1965, the Commission denied a petition for a reconsideration. Both Amalgamated, in Civil Action No. 684–65, and American Buslines, in Civil Action No. 644–65, attack this order.

In the *Overnite* proceedings, the Commission approved the purchase by Overnite of Rutherford Freight Lines, "in view of vendor's declining traffic and revenues and the resulting trend toward substantial deficits which, if continued, will result only in its demise as a carrier". The Commission rejected the argument of the Teamsters Union that the transaction be denied on the grounds that Overnite was a non-union motor carrier and approved the transaction, subject to the customary protection in motor carrier cases of three months' severance pay payable to the adversely affected em-

ployees, which it found to be just, reasonable and adequate protection.

The following statutes are involved:

Section 5(2) (c) of the Interstate Commerce Act, 49 U.S.C. § 5(2) (c)—In passing upon any proposed transaction under the provisions of this paragraph (2), the Commission shall give weight to the following considerations, among others: (1) the effect of the proposed transaction upon adequate transportation service to the public; (2) the effect upon the public interest of the inclusion, or failure to include, other railroads in the territory involved in the proposed transaction; (3) the total fixed charges resulting from the proposed transaction; and (4) the interest of the carrier employees affected.

Section 5(2) (f) of the Act, 49 U.S.C. § 5(2) (f)—As a condition of its approval, under this paragraph (2), of any transaction involving a carrier or carriers by railroad subject to the provisions of this part, the Commission shall require a fair and equitable arrangement to protect the interests of the railroad employees affected. In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. Notwithstanding any other provisions of this Act, an agreement pertaining to the protection of the interests of said employees may hereafter be entered into by any carrier or carriers by railroad and the duly authorized representative or representatives of its or their employees.

The defendants, The United States of America and the Interstate Commerce Commission, suggest that the questions raised by these three consolidated cases are as follows:

1. Does the Commission policy to protect motor carrier and railroad employees differently have a rational basis and warrant in the statute?

2. Is the protection granted the motor carrier employees in the two purchase transactions before the Court fair and equitable both to the employees and the involved motor carriers?

3. Does the Commission have statutory authority to require compulsory arbitration of disputes over the protection it affords employees as a condition to its approving a transaction under Section 5 of the Act?

We agree.

Motor carrier employees do not need very much financial protection from the adverse effects of Section 5 transactions, for they move in an expanding industry and possess quite a degree of transferability within the industry itself. We also agree with the Commission that "the skills of motor carrier employees are more adaptible (sic) than the more technical and limited skills of most railroad employees". Displaced railroad employees meet with more difficulties in obtaining similar positions and, therefore, they need more protection than do motor carrier employees.

The standard of fair and equitable protection which the Commission must grant to motor carrier employees will not be found in the standard established for railroad employees. While Section 5(2) (f) of the Act requires certain minimum financial protection over a period of four years to railroad employees, no such requirement has ever been enacted by the Congress for motor carrier employees. In the railroad cases, the minimum protection is prescribed by the statute, and discretion is given only to increase such protection, while in the motor carrier cases, no minimum is prescribed by the statute, for the statute only grants a

discretion to award protection to motor carrier employees that is fair and equitable.

The Commission was not required to follow the mandate of the Congress regarding the minimum protection granted railroad employees as a guide to the minimum protection for motor carrier employees. We cannot say that, under the circumstances of these cases, the motor carriers' employees involved are so similarly situated to railroad employees as to entitle them to more protection than the Commission has awarded them.

■ We hold, therefore, that the policy of the Interstate Commerce Commission to protect employees affected by financial transactions between motor carriers differently from employees where railroads are involved is supported by a rational basis and is authorized by the statute.

In the *Midwest Buslines* case, the employees are protected from the adverse effects which resulted from the transaction, while in *Overnite,* the protection extends to employees in a transition from one job to another in the motor carrier industry. In *Overnite,* the Commission found that three months' severance pay would provide "benefits to dismissed employees for a long enough period that aggressive job-hunting should be successful". It found, further, that three months pay would not impose "such a burden on vendee as to imperil its financial stability or as to preclude consummation".

The only financial loss to employees that the Commission could here attribute to the Midwest Buslines occurred with its employees who were required to change their place of residence following the strike. Congress has prescribed no minimum statutory criteria for motor carrier employees, for the only standard is whether the particular protection of each case is fair and equitable in the circumstances. The majority of the Commission has granted only such protection as the employees would have been entitled to had they followed their work, and such protection seems fair and equitable to employees of American Buslines.

■ We hold, therefore, that the protection given to motor employees of the two proceedings before the Court is fair and equitable to both the employees and the involved motor carriers.

In Civil Action No. 644–65, American Buslines take the position that the Commission has no authority to direct that disagreements over the amount of a particular lump-sum settlement be submitted to binding arbitration. This argument has no legal efficacy for the Commission's power to require binding arbitration has previously been sustained. See New Orleans and Northeastern Railroad Co. v. Bozeman, 312 F.2d 264 (5th Cir. 1963). The subject of arbitration will not be any labor-management matter, nor, as this Court has already decided, any matter foreclosed by the strike settlement agreement. The Commission requires only that disputes over the exact amount of lump-sum payments due particular individuals be submitted to an arbiter.

■ We hold, therefore, that the Commission may lawfully require compulsory arbitration of disputes over the protection granted employees as a condition to its approving a transaction under Section 5.

The three consolidated actions are dismissed and the two decisions of the Interstate Commerce Commission are sustained. This opinion constitutes the findings of fact and the conclusions of law, and counsel for the United States and the Interstate Commerce Commission shall submit an appropriate order not inconsistent with this opinion.